# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60340-3-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JACQUELINE LEE ROCHESTER, | |
| Appellant. | |

CHE, J. — Jacqueline Rochester appeals her conviction for two counts of unlawful delivery of a controlled substance.

The Thurston County Narcotics Task Force (TNT) conducted two buy/walks[1] with Rochester. Officers utilized a confidential informant (CI) with a hidden recording device and surveilled the buy/walks. The TNT provided the CI with marked cash after searching the CI. Both times, the CI returned from the transactions with fentanyl pills in their possession. After the second buy/walk, officers arrested Rochester and found the marked cash on her person.

During voir dire, a prospective juror disclosed that her mother knew Rochester. Later, the same prospective juror shared that she had a history with drug abuse with her mother and her mother's boyfriend and that she remembered she had met Rochester before. The State moved to excuse the prospective juror for cause, and Rochester did not object and did not raise any motion. The prospective juror was excused.

---

[1] "Buy/walk" is a term used by law enforcement to describe a tactic where an investigative organization provides money to a buyer who uses the money to buy drugs from a suspected seller. 2 Rep. of Proc. (RP) at 238. Then, both the buyer and the seller "walk away," the buyer leaving with the drugs, and the seller leaving with the investigative organization's money. 2 RP at 238. Law enforcement uses buy/walks to gather evidence for ongoing investigations.

Rochester moved in limine to exclude portions of the buy/walk audio recordings, citing hearsay and confrontation clause concerns. The trial court admitted the portions of the recordings containing the conversations between the CI and Rochester. The jury convicted Rochester on both counts.

At sentencing, the State requested $850 in restitution, to be paid to the TNT, based upon the amount of marked cash not recovered by the State. Rochester did not contest the restitution request, and the trial court imposed it.

On appeal, Rochester argues that the trial court violated her right to confront witnesses, violated her right to a fair trial by an impartial jury, and abused its discretion by imposing restitution.

We hold that the trial court did not violate Rochester's right to confrontation. Additionally, Rochester failed to properly preserve her claim that the trial court violated her right to a fair trial by an impartial jury, and as a result, we decline to consider the merits. And finally, we hold that the trial court did not abuse its discretion by imposing restitution.

Accordingly, we affirm.

## FACTS

Detective Sergeant Malcom McIver was a supervisor at the TNT and member of the Thurston County Sheriff's Office.[2] In June 2023, he began investigating whether Rochester was selling fentanyl pills. Several other officers assisted with the case. McIver enlisted the help of a CI, who agreed to assist the investigation in exchange for a reduction or dismissal of charges

---

[2] McIver testified at trial that the TNT's mission "is to dismantle middle to upper level drug dealers that are conducting business that affect[s] [Thurston] county." 2 RP at 225.

pending against them. McIver and the TNT planned two separate fentanyl buy/walk operations during their investigation of Rochester: one on June 14 and another on August 2.

On June 14, prior to the first buy/walk, officers searched the CI's person and vehicle for money, drugs, and weapons. Finding none, the TNT members gave the CI $800 in marked cash. TNT members also provided the CI an audio recording device to wear during the transaction with Rochester. McIver and another officer followed the CI to the prearranged location for the buy/walk transaction.

Another officer, who had travelled ahead, waited at the prearranged location and surveilled the transaction. The surveilling officer had been shown a photograph of Rochester prior to the transaction and recognized Rochester when she stepped out of a vehicle at the location. The officer observed Rochester carrying a bag of small blue pills in her hand. The officer watched Rochester enter the CI's vehicle for about five minutes. When Rochester left the CI's vehicle, the officer saw cash in her hands. The officer took multiple photographs of Rochester exiting her vehicle as well as entering and exiting the CI's vehicle.

After the sale, McIver and another officer followed the CI to a prearranged location. Upon meeting with the CI, the TNT members once again searched the CI's person and vehicle. The CI no longer possessed any marked cash, but the CI possessed fentanyl pills.

On August 2, McIver once again met with the CI prior to the planned buy/walk. TNT members searched the CI's person and vehicle. Then, the CI called Rochester to determine a meeting place. Again, the TNT provided the CI with $800 in marked cash as well as an audio recording device to wear during the buy/walk. McIver and another officer followed the CI to the arranged meeting place with Rochester. Other officers who were already present at the meeting

3

place surveilled the transaction. Rochester exited a black truck and briefly entered the CI's vehicle.

McIver and another officer followed the CI from the location of the buy/walk to a secondary meeting place and searched the CI's person and vehicle. They found one bottle of fentanyl pills as well as $20 of TNT marked cash.

Meanwhile, other TNT members followed Rochester. Eventually, McIver and other officers arrested Rochester and found $730 of TNT marked cash on her person.

The State charged Rochester with two counts of unlawful delivery of a controlled substance.

At the beginning of voir dire, the trial court instructed the jury that their decisions "must be made solely on the evidence presented during [the] proceedings." 1 Rep. of Proc. (RP) at 34. The trial court further explained the presumption of innocence, stating, "Ms. Rochester is presumed innocent." 1 RP at 35. Addressing the issue of bias, the trial court instructed, "bias and prejudice can play no part in any decisions you might make as a juror. Your decisions as jurors must be based solely upon an open-minded fair consideration of the evidence that comes to you during the trial." 1 RP at 36.

The trial court asked prospective jurors whether they were familiar with any of the parties, attorneys, or other officers of the court. In response, prospective juror 34 raised her hand and stated, "I believe the defendant is friends with my mom." 1 RP at 44. The trial court acknowledged the statement and asked, "would that impact your ability to fairly decide this case, fairly and impartially to both sides?" 1 RP at 44. Prospective juror 34 answered, "No." 1 RP at 44. The trial court continued questioning prospective jurors.

After questioning the prospective jurors about hardship issues, the trial court excused the jurors and asked counsel whether they had any motions to excuse prospective jurors due to hardship or cause. Neither the State nor defense counsel raised any issue with prospective juror 34.

Later in voir dire, prospective juror 34 explained that she had both positive and negative experiences with police in the past. When the State asked prospective juror 34 whether she could assure the court that she would be able to make decisions based upon the evidence, instead of past mistrust of police officers, prospective juror 34 responded, "I feel like I am not totally positive. I'm leaning more towards, yes, I would be able to do that, but I can't tell you for sure that I would." 1 RP at 116.

Toward the end of questioning, the trial court asked the prospective jurors, "do any one of you have any information to add to, modify, or clarify your answer to a prior question?" 1 RP at 130. Indicating that she had such information, prospective juror 34 engaged in the following exchange with the trial court:

> PROSPECTIVE JUROR 34: I mentioned that my mom possibly knows the defendant's mom, and I actually—I believe, now that I've sat here for a bit, I've met her a few times, and I have extensive history with drug abuse with my mom and also her boyfriend.
> And I just—I think it would be difficult for me to not put feeling into my judgment because of personal history and—and meeting this person before.
> THE COURT: And if I instructed you to set that prior knowledge aside, could you consider this case fairly and in an unbiased way for both sides?
> PROSPECTIVE JUROR 34: I—I think I could, but I could not be sure. I could not be a hundred percent sure.
> THE COURT: Okay. I'm going to ask it one more way.
> If I instructed you to do so, could you assure me that you would?
> PROSPECTIVE JUROR 34: Yes.

1 RP at 134.

5

After voir dire questions, the trial court again asked counsel whether they had any motions to excuse prospective jurors. The State moved to excuse prospective juror 34 for cause:

> Juror 34 indicated during—when I asked questions that based on her prior experience with law enforcement, she was not able to assure the parties she could judge that testimony fairly and impartially.
> Juror 34 also talked about her life experience, and she was not—I know that she said yes to the court's last question, but my note from what she said was yes with a question mark at the end. She was not strong in her affirmation to the court. So I would ask to excuse Juror 34 for cause.

1 RP 143-44. Defense counsel had no objection and raised no motions, and the trial court excused prospective juror 34 for cause.

After empaneling the jury, the trial court reminded the jury that it was their duty "to decide the facts in [the] case based upon the evidence presented to [them] in the courtroom during this trial." 1 RP at 155. The trial court defined "evidence" to include, "testimony of witnesses, documents, and physical objects," and reminded the jurors that the only evidence they could consider was that of "the testimony of witnesses and exhibits admitted into evidence." 1 RP at 155.

Rochester filed a motion in limine requesting that the trial court exclude the CI's recorded statements as testimonial hearsay, citing to the confrontation clause[3] as well as Evidence Rule (ER) 802.[4]

---

[3] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.

[4] "Hearsay is not admissible except as provided by these rules, by other court rules, or by statute." ER 802.

On the first recording, from the June 14 buy/walk, the CI whistled and called "Jackie"

multiple times. Exhibit (Ex.) 40 at 6:13-6:22. A few moments later, the following relevant

exchange occurred:

>  [ROCHESTER:] How much do you got?
>  [CI:] Eight.
>  [ROCHESTER:] For how many?
>  [CI:] Four.
>  . . . .
>  [ROCHESTER:] 'Cause I—I paid two dollars for 'em. You told me you were sellin' 'em for four. That's what I thought. I'm not tryin' to get over on you or nothin' but that's what I thought.
>  [CI:] You said you would do four for eight. . . .
>  [ROCHESTER:] I must'a—we must'a misunderstood each other.
>  [CI:] So, okay. So, what can I get for eight then? . . .
>  [ROCHESTER:] That would be . . .
>  . . . .
>  [CI:] . . . three twenty.
>  [ROCHESTER:] You gonna make me count out all of them, or can I just take out the eighty?
>  . . . .
>  [ROCHESTER:] I wish I had that pill counter . . .

Ex. 40 at 6:58-7:03; 7:24-7:58; 8:19-8:26; 8:56-58.

On the second recording, from the August 2 buy/walk, the conversation included, in

relevant part,

>  [ROCHESTER:] I'm so grumpy . . . I've been dopesick all day . . .
>  . . . .
>  [ROCHESTER:] Bro I just f[******] been going through it and I b-haven't had any fetty . . .
>  . . . .
>  [CI:] This is four?
>  [ROCHESTER:] Yeah.
>  [CI:] All right, that's eight.
>  [ROCHESTER:] Okay. Thank you.

Ex. 41 at 8:36-8:39; 8:45-8:48; 8:59-9:02.

Rochester argued that the CI's statements on the recordings from June 14 and August 2, were testimonial. The State argued that the CI's statements were not hearsay because they were not being offered for their truth, but instead, for their effect on the listener. The State contended that the CI's statements gave context to the statements made by Rochester and the conversation that occurred in the recordings. Rochester countered that the State was offering the CI's statements "to show why the police officers took [the] actions that they did." 1 RP at 23-24.

The trial court responded,

> But there is—there is a body of more recent case law. It is unpublished, but it does discuss use of a confidential informant and that when the confidential informant statements are coming in not for the truth of the matter asserted but just for the background of the conversation occurring—so for example, a confidential informant stating I want to buy—I want to buy a baggie of pills—that statement wouldn't be coming in for the truth of the matter asserted and it would not be relevant for the truth of the matter asserted since they're not the defense. And the courts of appeal have, in recent years, said that is not hearsay.

1 RP at 24.

Later, after listening to both recordings, the trial court heard further argument. Rochester argued that the CI's statements were "testimonial and subject to the confrontation clause" because the CI would have reasonably expected their statements to be used for prosecution. 2 RP at 211.

The State countered that the CI's statements were "not hearsay because they [were] not being offered for the truth of the matter asserted." 2 RP at 212.

The trial court ruled,

> the statements made by the [CI], they are not offered for the truth of the matter asserted. Having listened to them, they do not feel testimonial.
>     They are—and they are—proof of those statements is just simply not what this case is about.

> This case is about the defendant's desire or carrying out of the sale. It is not to prove whether or not the [CI] actually wanted to purchase something.
>
> Those statements, I'm holding, are not hearsay and they are not testimonial statements, and, therefore, they may come in.

2 RP at 215-16. Rochester made no objection to McIver's ability to authenticate the recordings and identify the voices in the recordings.

During trial, witnesses, including McIver, testified consistently with the facts above. The CI did not testify. The trial court admitted the audio recordings from the June 14 and August 2 buy/walks as exhibits 40 and 41 respectively. McIver testified that in both recordings, the three voices belonged to himself, the CI, and Rochester.

The trial court also admitted the photographs taken by the surveilling officers during both buy/walks. The jury convicted Rochester of both counts.

At sentencing, the State requested that Rochester be ordered to pay $850 in restitution to the TNT for "the buy funds that were not recovered by [the TNT]." 4 RP at 553. Rochester responded, "I'm not contesting that, Your Honor." 4 RP at 555-56. The trial court ordered restitution in the amount of $850 to be paid to TNT, also finding that Rochester was indigent.

The trial court sentenced Rochester to 16 months confinement and 12 months community custody.

Rochester appeals.

## ANALYSIS

### I. THE CONFRONTATION CLAUSE

Rochester argues that both audio recordings played for the jury were testimonial, and that because the CI did not testify at trial, the admission of the recordings violated her confrontation rights. We disagree.

9

Both our federal and state constitutions protect a criminal defendant's right to confront the witnesses against them. *State v. Hall-Haught*, 4 Wn.3d 810, 813, 569 P.3d 315 (2025); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. We review an alleged violation of the confrontation clause de novo. *Hall-Haught*, 4 Wn.3d at 816.

"The confrontation clause bars the admission of testimonial hearsay statements where the declarant does not testify at trial and the defendant had no prior opportunity to confront the witness under oath." *State v. Melland*, 9 Wn. App. 2d 786, 806, 452 P.3d 562 (2019) (published in part). A statement only implicates the confrontation clause when it is both hearsay and testimonial—these are separate issues. *Smith v. Arizona*, 602 U.S. 779, 800, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024).

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. ER 801(c). We review whether a statement was hearsay de novo. *State v. Gonzalez-Gonzalez*, 193 Wn. App. 683, 688-89, 370 P.3d 989 (2016).

Statements are testimonial when "'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Hall-Haught*, 4 Wn.3d at 815 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)). Testimonial statements may include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," and certain police interrogations. *Melland*, 9 Wn. App. 2d at 807 (quoting *Crawford v. Washington*, 541 US 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

Statements are nontestimonial when "the 'primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Hall-Haught*, 4 Wn.3d at 816 (quoting *Davis*, 547 U.S. at 822, 126 S. Ct. 2266). The State bears the burden of showing that

challenged statements are nontestimonial on appeal. *State v. McDaniel*, 155 Wn. App. 829, 846, 230 P.3d 245 (2010).

On appeal, violations of the confrontation clause are subject to a harmless error analysis. *Melland*, 9 Wn. App. 2d at 810. Error is harmless if we are convinced beyond a reasonable doubt that, in the absence of the error, the jury would have reached the same result. *Id.* at 810. We determine whether the untainted evidence is so overwhelming so as to necessarily lead to a finding of guilt. *Id.*

Rochester argues that the CI's statements violated the confrontation clause because they were testimonial, but she does not appear to provide any argument that the CI's recorded statements were hearsay, and thus, offered for their truth. Because a statement must be both testimonial and hearsay to implicate the confrontation clause, Rochester's claim may only succeed if the out-of-court statements at issue came into evidence for their truth. *Smith*, 602 U.S. at 792; *Hall-Haught*, 4 Wn.3d at 821. Rochester's claim fails because the statements were not hearsay.

This court reviewed a similar issue in *State v. Chambers*, 134 Wn. App. 853, 142 P.3d 668 (2006). In that case, an undercover detective was approached by a man whom the detective suspected would try to purchase drugs. *Id.* at 855. The detective asked the man whether he had money, to which the man replied that he did. *Id.* at 856. The man asked how much "it" would cost, and the detective gave him a price. *Id.* (quoting record). The man walked to his vehicle, consulted with the defendant, and came back with money to purchase the drugs. *Id.* At trial, the detective was allowed to testify about the statements made to him by the man. *Id.*

On appeal, the defendant in that case argued that the man's statements were hearsay and that their admission violated his right to confrontation. *Id.* at 858. However, this court disagreed. *Id.* at 859. We concluded that the State had not offered either the man's statements about having money, or his question about the cost of the drugs, to prove that the man actually had money or wanted to know the price. *Id.* at 858. Instead, we concluded that the statements were not hearsay because they had merely been offered "to prove that a dialogue occurred between [the man] and [the detective] about purchasing drugs." *Id.* at 859.

Here, like in *Chambers*, the CI's recorded statements were offered not for their truth, but instead, to provide context for Rochester's statements, which she does not challenge. In other words, the CI's statements were offered to prove that two conversations occurred. The truthfulness of the CI's statements was completely irrelevant. Instead, Rochester's responses were relevant, showing that she engaged knowingly in the transactions. Essential to this analysis is the fact that the recordings contain the voices of both parties to the conversation: the CI and Rochester. Because the recordings provide admissible statements made by Rochester during the transactions, the CI's statements were necessary to contextualize Rochester's otherwise free-floating comments by showing that a dialogue occurred.

Moreover, the CI's recorded statements were also offered to show their effect on the listener—Rochester. Again, the veracity of the CI's statements was irrelevant to this case. Instead, the CI's statements were an essential part of the conversation with Rochester and helped inform the jury as to what Rochester was discussing and doing in the CI's car on both June 14 and August 2.

Because the CI's statements were not hearsay, the confrontation clause is not implicated, and we need not address whether their admittance was harmless error. We conclude that this claim fails, and the audio recordings were admissible.

## II. THE RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY

Next, Rochester argues for the first time on appeal that comments made by prospective juror 34 during voir dire deprived her of her right to a fair trial by an impartial jury. The State responds that Rochester failed to preserve this asserted error for review under RAP 2.5(a)(3) because she did not object or move for a new trial below, and while the issue may be of constitutional magnitude, Rochester fails to demonstrate that the error was manifest. We agree that Rochester fails to demonstrate that the error was manifest and decline to reach the merits of Rochester's claim.

Both our federal and state constitutions guarantee a criminal defendant's right to trial by an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020). To be impartial, a jury must be unbiased and unprejudiced. *State v. Martinez-Loyola*, 35 Wn. App. 2d 521, 529, 576 P.3d 590 (2025) (published in part), *review granted*, 5 Wn.3d 1034 (2026).

Generally, we may "refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). Thus, if an error is unpreserved, we may decline to review it. *State v. Clare*, 30 Wn. App. 2d 309, 315, 544 P.3d 1099 (2024). This is, at least in part, because the failure of a party to object at trial deprives the trial court of the opportunity to correct or cure the error (through striking testimony, providing curative jury instructions, or other appropriate means). *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).

"However, a party may raise an unpreserved error if they show that the error presents a 'manifest error affecting a constitutional right.'" *Clare*, 30 Wn. App. 2d at 315 (quoting RAP 2.5(a)(3)). We construe this exception narrowly. *Kirkman*, 159 Wn.2d at 935. The asserted error must be "of constitutional dimension" and it must be manifest. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). For an asserted error to be manifest, the defendant must make "a plausible showing of (1) actual prejudice, meaning 'the asserted error had practical and identifiable consequences in the trial,' and (2) 'error . . . so obvious on the record that the error warrants appellate review.'" *State v. Ianniciello*, 36 Wn. App. 2d 258, 263, 582 P.3d 372, *review granted*, 589 P.3d 789 (2026) (quoting *O'Hara*, 167 Wn.2d at 99-100).

Here, Rochester failed to object. Issue preservation is a well-known legal concept and Rochester did not object, which deprived the trial court of the opportunity to correct or cure any alleged error. Rochester argues that her asserted error meets the requirement of a manifest error affecting a constitutional right because "The statement that Ms. Rochester has connections to people who abuse drugs was likely 'to have substantially affected or influenced the verdict.'" Br. of Appellant at 19 (quoting *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997)). We disagree.

Prospective juror 34 did not comment on Rochester's guilt or on the strength of the State's case against Rochester. Prospective juror 34 simply stated that she believed her mom knew Rochester and that prospective juror 34 herself met Rochester a few times. Prospective juror 34 also mentioned that she herself had "extensive history with drug abuse with my mom and also [my mom's] boyfriend." 1 RP at 134.

Prospective juror 34 never stated that Rochester sold or used drugs at any time; that Rochester used drugs with prospective juror 34, the prospective juror's mom, or her mom's

boyfriend; or that there was any connection between Rochester and drug sale or use. At most, prospective juror 34's statements were ambiguous. Her comments could have meant she was concerned because she had met Rochester before; or the prospective juror, her mother and/or her mother's boyfriend had extensively abused drugs, alone or together, but not with Rochester. The prospective juror never stated that drugs were used by herself, the mother, or mother's boyfriend when Rochester was friends with the prospective juror's mother. The record does not support Rochester's contention that some connection to people who had at some time abused drugs was likely to have substantially affected or influenced the verdict.

Even if we assume the issue is of constitutional magnitude, Rochester does not plausibly show that the asserted error was manifest. Rochester fails to demonstrate any practical and identifiable consequences of prospective juror 34's comments. The State presented considerable evidence of Rochester's guilt, and the trial court instructed the jury to consider only evidence properly introduced at trial. Multiple law enforcement officers who witnessed both the June 14 buy/walk as well as the August 2 buy/walk testified about the events of those transactions. The TNT provided the CI with marked cash to purchase fentanyl from Rochester, and after the August 2 buy/walk, TNT members arrested Rochester, finding the marked bills on her person. Finally, the State admitted photographs of Rochester at both buy/walks, consistent with the officers' testimony. Even if we disregarded the two recordings, there was overwhelming evidence of Rochester's sales of the drugs.

The trial court also instructed the jury on several occasions, regarding the presumption of innocence, the importance of making decisions without bias, and the fact that it could only consider evidence presented during trial. Absent a showing to the contrary, we presume jurors

15

follow instructions. *State v. Weaver*, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021). Further, prospective juror 34 was excused and did not have any further opportunity to discuss her venire comments with the jury.[5] For all these reasons, Rochester cannot show that the comments made by prospective juror 34 during voir dire had practical or identifiable consequences at trial.

Despite this, Rochester relies upon the ninth circuit's opinion in *Mach*, 137 F.3d 630, to support her argument. However, *Mach* is both procedurally and factually inapposite.

In that case, the Ninth Circuit considered a federal district court's denial of Mach's habeas petition seeking relief from a conviction for sexual conduct with a minor in Arizona state court. *Id.* at 631. At Mach's trial, a prospective juror identified herself as a professional social worker, employed by the State. *Id.* at 631-32. She stated, in the presence of the venire, that she would struggle to be impartial because of her professional field and "that sexual assault had been confirmed in every case in which one of her clients reported such an assault." *Id.* at 632. She repeated this statement, in some form, at least three more times, in front of the venire. *Id.*

Later, the same prospective juror, in response to further questions, explained in front of the venire that she had an extensive background working with psychologists and psychiatrists, and that she herself had taken courses in child psychology. *Id.* at 632. Mach moved for a mistrial, "arguing that the entire panel had been tainted by the exchange" between the trial court and the prospective juror. *Id.* The trial court denied Mach's motion but struck the prospective juror for cause. *Id.* Once more, Mach moved for a mistrial, and once more, the trial court denied the motion. *Id.*

---

[5] *See Guevara Diaz*, 11 Wn. App. 2d at 854 (citing *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015)) (An appellant may raise the issue of juror bias for the first time on appeal where the record demonstrates actual bias and the biased juror was seated).

On review, because it was reviewing a state court's determination in a habeas proceeding, the Ninth Circuit held that the error required reversal under the harmless error standard. *Id.* at 632, 634 ("Under the harmless-error standard, we must determine whether the error had 'substantial and injurious effect or influence in determining the jury's verdict'") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 1717, 123 L. Ed. 2d 353 (1993)). The court held,

> The result of the trial in this case was principally dependent on whether the jury chose to believe the child or the defendant. There can be no doubt that [the prospective juror's] statements had to have a tremendous impact on the jury's verdict. The extrinsic evidence was highly inflammatory and directly connected to Mach's guilt. [The prospective juror] repeatedly stated that in her experience as a social worker, children never lied about sexual assault. The bulk of the prosecution's case consisted of a child's testimony that Mach had sexually assaulted her.

*Id.* at 634. Thus, the Ninth Circuit held that the prospective juror's statements substantially affected the verdict and granted Mach's habeas petition. *Id.*

Here, in contrast, prospective juror 34 only mentioned her knowledge of Rochester twice and only mentioned her personal history with her mother and drugs once. Further, prospective juror 34 did not comment directly on the evidence, but instead, explained both how she knew Rochester and what her own personal history was with drugs. Additionally, the statements made by the prospective juror in *Mach* carried significant weight because of her professional background and expertise, whereas here, prospective juror 34's comments were based entirely on personal, not professional, experience. Finally, in *Mach*, the court was considering a claim under its federal habeas harmless error standard. Here, the question is whether Rochester plausibly shows that prospective juror 34's comments had practical or identifiable consequences at trial. For these reasons, Rochester's reliance on *Mach* is unavailing.

17

Because Rochester fails to make a plausible showing that prospective juror 34's comments had practical and identifiable consequences at trial, the asserted error is not manifest. Thus, Rochester fails to preserve this issue for appeal, and we decline to consider the merits.

## III. RESTITUTION

Finally, Rochester argues that because she was indigent, the trial court erred by imposing restitution at sentencing. In response, the State argues that Rochester failed to preserve her challenge on appeal, and further, that even if her claim is properly preserved, it should fail because the trial court was not required to consider Rochester's indigency in deciding to impose restitution. Without deciding whether Rochester was required to preserve her claim for appeal, we conclude that the trial court did not abuse its discretion in imposing restitution in the amount of $850.[6]

When a trial court crafts a restitution order pursuant to the restitution statute, RCW 9.94A.753, we review it for an abuse of discretion. *State v. Morgan*, 4 Wn.3d 261, 265, 562 P.3d 360 (2025). A trial court abuses its discretion when it applies an "'incorrect legal analysis or other error of law.'" *Morgan*, 4 Wn.3d at 265 (quoting *State v. Tobin*, 161 Wn.2d 517, 523, 527, 166 P.3d 1167 (2007)). The restitution statute grants considerable discretion to trial courts and allows those courts the ability to impose no restitution in some circumstances and "double the offender's gain or the victim's loss" in others. *Morgan*, 4 Wn.3d at 268; *see* RCW

---

[6] The State argues that Rochester failed to preserve her claim for appeal because at sentencing, defense counsel did not contest the restitution amount requested by the State. Br. of Resp't at 48. In her reply brief, Rochester argues that defendants may challenge improperly imposed LFOs for the first time on appeal, citing to *State v. Duncan*, 185 Wn.2d 430, 437, 374 P.3d 83 (2016) and *State v. Ramos*, 24 Wn. App. 2d 204, 212-15, 520 P.3d 65 (2022). We need not determine whether these cases required Rochester to preserve her claim because assuming, without deciding, that Rochester did not need to preserve her claim, her claim still fails.

9.94A.753(3)(a) ("The amount of restitution shall not exceed double the amount of the

offender's gain or the victim's loss from the commission of the crime.").

Restitution is "a specific sum of money ordered by the sentencing court to be paid by the

offender to the court over a specified period of time as payment of damages." RCW

9.94A.030(44). A legal financial obligation (LFO) "may include restitution to [a] victim." RCW

9.94A.030(31). However, "[r]estitution is prioritized and treated differently from other LFOs.

For example, an offender is not required to pay costs if indigent but must still pay restitution."

*Morgan*, 4 Wn.3d at 267; *see also* RCW 9.94A.760(1) ("An offender being indigent . . . is not

grounds for failing to impose restitution"). Generally, "[t]he portion of the sentence concerning

restitution may be modified as to amount, terms and conditions. . . . The court *may not reduce*

the total amount of restitution ordered because the offender may lack the ability to pay the total

amount." RCW 9.94A.750(4) (emphasis added).

"In 2020, the legislature amended RCW 9.94A.753 to add subsection (3)(b), which

affords courts the discretion to reduce restitution owed to insurers and state agencies based on an

offender's inability to pay." *Morgan*, 4 Wn.3d at 270. That subsection reads, in relevant part,

> At any time, including at sentencing, the court may determine that the
> offender is not required to pay, or may relieve the offender of the requirement to
> pay, full or partial restitution and accrued interest on restitution where the entity
> to whom restitution is owed is an insurer *or state agency* . . . if the court finds that
> the offender does not have the current or likely future ability to pay. A person
> does not have the current ability to pay if the person is indigent as defined in
> RCW 10.01.160(3).

RCW 9.94A.753(3)(b) (emphasis added). "'State agency' includes every state office,

department, division, bureau, board, commission, or other local state agency." RCW

42.56.010(1); *see* RCW 9.94A.753(3)(b) (stating that "state agency" has the same meaning as

defined by RCW 9.94A.750(3) and RCW 9.94A.750(3)(b)(iii) (stating that "stage agency has the same meaning as defined by RCW 42.56.010(1)).

Rochester argues that RCW 9.94A.753(3)(b) makes the payment of restitution to a state agency discretionary, and as a result, the trial court abused its discretion by imposing restitution to a state agency upon an indigent defendant. We disagree.

Even if the TNT qualifies as a state agency under the restitution statute, RCW 9.94A.753(3)(b) simply granted the trial court discretion to relieve Rochester of any requirement to pay restitution; it did not require the trial court to do so. The statute clearly states that a trial "court *may* determine that the offender is not required to pay . . . if the person is indigent." RCW 9.94A.753(3)(b) (emphasis added).

Thus, regardless of whether the trial court found Rochester indigent at sentencing, the trial court did not abuse its discretion by imposing restitution. Here, the State requested $850 in restitution. This was the exact value of the loss incurred by the TNT, and gain experienced by Rochester, as a result of Rochester's criminal conduct. Thus, the amount requested was reasonable according to the statute. *See* RCW 9.94A.753(3)(a).[7]

The trial court did not abuse its discretion by imposing $850 in restitution at sentencing. This claim fails.[8]

---

[7] Rochester may later request waiver or reduction of restitution interest. *See* RCW 10.82.090(3)(c) and RCW 10.82.090(b).

[8] Rochester's argument that restitution was discretionary in this case rests upon an assumption that RCW 9.94A.753(3)(b) applies because the TNT is a state agency. The State counters that the TNT is not a state agency, and is instead, "a collaboration of agencies." Br. of Resp't at 43-45, 49. We need not reach this issue because even if the TNT is a state agency for purposes of RCW 9.94A.753(3)(b), the trial court may still exercise its discretion in imposing restitution for the reasons outlined in the opinion.

CONCLUSION

We hold that the trial court did not violate Rochester's right to confrontation.

Additionally, Rochester failed to properly preserve her claim that the trial court violated her right

to a fair trial by an impartial jury, and as a result, we decline to consider the merits. And finally,

we hold that the trial court did not abuse its discretion by imposing restitution. Accordingly, we

affirm.

A majority of the panel, having determined that this opinion will not be printed in

the Washington Appellate Reports but will be filed for public record in accordance with

RCW 2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Cruser, J.

_____
Price, A.C.J.